IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

```
ADT SECURITY SERVICES, INC.,  )
et al.,                        )
                               )
          Plaintiffs,          )
                               )
     v.                        )     No. 10 C 4382
                               )
LISLE-WOODRIDGE FIRE           )
PREVENTION DISTRICT, et al.,   )
                               )
          Defendants.          )
```

MEMORANDUM OPINION AND ORDER

On November 23, 2010 this Court granted a preliminary injunction against defendants Lisle-Woodridge Fire District ("District") and Chicago Metropolitan Fire Prevention Company ("Chicago Metro"). In the wake of that ruling, which is now before our Court of Appeals for review, Plaintiffs[1] have filed a motion for partial summary judgment solely against District,[2] asserting claims for violations of various constitutional rights, antitrust laws and the Illinois law of tortious interference. Plaintiffs also reiterate their argument that District lacked statutory authority for its actions, the issue that triggered the

---

[1] "Plaintiffs" comprise Delaware corporation ADT Security Services, Inc. ("ADT") and four Illinois corporations: Alarm Detection Systems, Inc. ("ADS"), D.M.C. Security Services, Inc., Illinois Alarm Services, Inc. and SMG Security Systems, Inc.

[2] District had earlier moved for a stay of the preliminary injunction pending resolution of the appeal. On December 28, 2010, in its Case No. 10-3754, our Court of Appeals denied that motion, stating that District "has not presented arguments that demonstrate a likelihood of success on appeal or irreparable injury absent a stay."

entry of the preliminary injunction.

In Plaintiffs' view, success on those substantive claims entitles them to injunctive and declaratory relief against District in the form of a permanent injunction, as well as damages. Needless to say, District has responded with a vigorous opposition to Plaintiffs' contentions. After careful consideration of both sides' submissions, this Court grants Plaintiffs' motion and orders the issuance of a permanent injunction for the reasons set forth below.[3]

**Summary Judgment Standard**

Every Rule 56 movant bears the burden of demonstrating the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). But a nonmovant must produce more than "a mere scintilla of evidence" to support the position that a genuine issue of material fact exists (Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008)) and "must come forward with specific facts demonstrating that there is a genuine issue for

---

[3] Chicago Metro has, for its part, submitted its own motion for summary judgment against Plaintiffs. That motion is currently pending, as the parties have engaged in a series of skirmishes relating to the need for discovery and what constitutes an appropriate statement of facts.

trial" (id.).[4]

Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). What follows is a summary of the relevant facts,[5] viewed of course in the light most favorable to nonmovant District.

**Factual Background**

Plaintiffs are companies that sell fire and burglar alarm monitoring services to commercial buildings and multifamily residential buildings in the Lisle-Woodridge Fire Prevention District (Compl. ¶¶2-6). Plaintiffs monitor those fire alarm systems pursuant to standards promulgated by District, which is organized under the Illinois Fire Protection District Act ("Act," 70 ILCS 705/1 to 705/24).[6] All Plaintiffs except ADT transmit

---

[4] At the summary judgment stage, of course, a nonmovant need not "establish" or "show" or "prove" anything, but must merely demonstrate that a genuine issue of material fact exists. This opinion employs those terms only because the cited cases use that terminology, but it imposes on nonmovant District the lesser burden described in this footnote.

[5] LR 56.1 requires parties to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which facts are agreed upon. This opinion cites to Plaintiffs' LR 56.1 statement as "P. St. ¶ --," to District's LR 56.1 statement as "D. St. ¶ --" and to District's memorandum of law as "D. Mem."

[6] All further references to Act provisions will simply take the form "Act §--," employing the ILCS section number but omitting the introductory "70 ILCS 705/."

fire alarm signals to central stations by means of wireless radio transmitters (P. St. ¶¶2, 9). In case of a fire alarm, central station operators alert Dupage Public Safety Communications ("Du-Comm"), which in turn communicates with District to coordinate any necessary emergency response (id. ¶10).

ADT, by contrast, uses a phone-based network that transmits signals to a transmission board at District, which is itself directly connected to Du-Comm's fire alarm board (hence the term "direct connect")(P. St. ¶¶11, 12). ADT does not use wireless technology because a prior ordinance had prohibited central station monitoring outside the Chicago metropolitan area, while all of ADT's central stations are located outside of Illinois (id. ¶11).

Both types of Plaintiffs' systems (wireless and telephonic) were in compliance with national standards and approved by District (P. St. ¶¶7, 13). Typically the customers for whom Plaintiffs have agreed to provide fire alarm monitoring services have (or had) contracts of a duration of five to seven years, with provisions for automatic renewal (id. ¶3).

Dissatisfied with the reliability of ADT's phone-based system,[7] in 2007 District studied the feasability of replacing it with a wireless radio network and concluded that such action

---

[7] District identifies several problems that it had with Plaintiffs' respective monitoring networks at D. St. ¶¶9, 10.

would have numerous safety-related and efficiency-related advantages (P. St. ¶14; D. St. ¶¶11-14). In September 2009 District's Board of Trustees adopted and implemented Ordinance 09-06 (the "Ordinance"), which mandated the use of a direct-connect wireless (as opposed to phone-based) fire alarm monitoring network (P. St. ¶34). That wireless radio system was to send signals directly to District and thus eliminate the need for central stations (id. ¶36).

To implement that wireless network, the Ordinance specified that District would purchase the necessary equipment and a company of its choice would operate it (Compl. Ex. B). Subscribers were required to enter into five-year contracts and pay fees for the provision of that service (id.). District's motivation in passing the Ordinance was self-described as an "effort to provide better protection against fire" (id.). District later entered into a five-year contract with Chicago Metro to install and then maintain the wireless network (P. St. ¶36; D. St. ¶22).[8] Thus District agreed to purchase radios from Chicago Metro and took out a significant loan to cover the cost of purchasing, maintaining and monitoring the network (D. St. ¶¶22, 26).

District sent a notice in December 2009 to all affected

---

[8] District had also met with ADS and ADT to discuss the possibility of implementing a wireless radio network (D. St. ¶15). Each of ADS and ADT then submitted a proposal to provide such a network, both of which were rejected (P. St. ¶26).

5

customers of fire alarm services, informing them that their current contracts with other fire alarm companies (hence with any Plaintiff) were superseded and thus "null and void" (P. St. ¶40). That notice was accompanied by a written contract under which the subscriber would have to pay District $66 each month in monitoring fees (D. St. ¶27). In January 2010 District sent a second notice modifying the first, so that alarm monitoring contracts that were currently in force would be allowed to expire before the subscriber was required to join the network (P. St. ¶41). As of June 2010 ADT had lost all of its commercial accounts in the District, and ADS reported that "several" accounts had been labeled as terminated by the subscribers before the expiration of their contracts (id. ¶¶48, 50). District, for its part, had over three hundred accounts as of the time of the Preliminary Injunction order (id. ¶52).

In July 2010 Plaintiffs filed this action against District and Chicago-Metro for preliminary and injunctive relief. This Court granted a preliminary injunction on November 23, 2010, and in doing so suspended implementation of the Ordinance, reinstated the customer contracts that had previously been in place and permitted Plaintiffs to resume fire alarm monitoring services.[9]

---

[9] On December 15, 2010 this Court issued an Amended Preliminary Injunction order nunc pro tunc November 23, 2010, containing only minor modifications.

**Legal Authority**

At base this action turns on whether District, an entity whose limited powers are granted to it by the General Assembly, has legal authority to engage in the fire alarm monitoring business. That determination depends on a close inspection of the Act, the enabling legislation that establishes all such fire protection districts in Illinois. In that respect District contends that the necessary authority is conferred by Act §1--the statutory preamble:

> It is hereby declared as a matter of legislative determination that in order to promote and protect the health, safety, welfare and convenience of the public, it is necessary in the public interest to provide for the creation of municipal corporations known as fire protection districts and to confer upon and vest in the fire protection districts all powers necessary or appropriate in order that they may engage in the acquisition, establishment, maintenance and operation of fire stations, facilities, vehicles, apparatus and equipment for the prevention and control of fire therein and the underwater recovery of drowning victims, and provide as nearly adequate protection from fire for lives and property within the districts as possible and regulate the prevention and control of fire therein; and that the powers herein conferred upon such fire protection districts are public objects and governmental functions in the public interest.

As District would have it, the plain meaning of that section authorizes it to engage in the alarm monitoring business because it is "necessary or appropriate" to "acqui[re]" fire alarm monitoring equipment to "provide as nearly adequate protection from fire...." Indeed, District goes on, it has a legal obligation to do so, for it has determined that the Ordinance

7

would provide more effective fire protection than the privately-owned systems that it seeks to displace.

Any such all-encompassing reading of the Act's preamble is wholly unpersuasive. As this Court stated orally on October 6, 2010 and again in its December 22, 2010 Preliminary Injunction order, Act §1 is not the last--or even the first--word on the scope of District's actual authority. It is not a blanket source of power, but instead simply authorizes the creation of fire districts (as its title "Creation authorized" suggests) and states a general legislative purpose.

And consistent with what one might call the "classic" structure of statutes that establish different municipal entities, each possessing limited defined powers, specific grants of authority are then enumerated in separate sections following the preamble. Indeed, the clearly more appropriate (and normal) reading of such a preamble is that it sets out a general policy statement, while it is left to the sections that follow to define specifically what the General Assembly deems "all powers necessary and appropriate" to carry out that policy--the preamble itself does not perform that definitional function.

If District's approach to the contrary were sound, our statute books would occupy far less space--after all, the broad and generalized language in an act's statement of purpose would render wholly superfluous the particularized enactments of

8

authority that invariably follow the statutory preamble. Moreover, if District's contention were correct, that typical statutory structure would engender confusion and ambiguity: Would or would not the generalized language of a preamble fill in the interstices left by the legislature in a later section's narrow grant of power so as to confer authorization beyond the boundaries of the latter provision?

This analysis is of course a matter of logic and right reason, sources that regrettably do not always inform legal doctrine. But in this instance what has just been set out in logical terms is fully confirmed by a close look at the language and structure of the Act itself. Thus both Act §1 and Act §11, for instance, repeat the identical language as to the obligation of fire districts "to provide as nearly adequate protection from fire...as possible" and to regulate "the prevention and control of fire therein." If District were right that Act §1 alone gave it blanket authority to engage in collateral activities such as the fire alarm monitoring business, there would have been no need for Act §11 to set out the same generality and then, even more importantly, to go on granting specific itemized powers. Or put a bit differently, if District correctly viewed Act §1 as a sweeping grant of power, all of the later (and numerous) sections of the Act that delineate and confer express powers would be supererogative.

It is abundantly clear that the authority to engage in the fire alarm monitoring business is not among the specific grants of power conferred by Act §11. Importantly, Act §11 gives fire districts the specific authority to "maintain life saving and rescue equipment, services and facilities, including an emergency ambulance service." Entering the fire alarm monitoring business and owning a fire alarm monitoring network are conspicuous by their absence from that grant of power--what District has sought to confer on itself here is plainly of a different stripe than "life-saving and rescue equipment, services and facilities" (id.). Nor can it be said that going into the fire alarm monitoring business is a "necessary regulation[ ] for the prevention and control of fire therein."[10] Thus District's proposed all-inclusive reading of "prevention and control of fire" falls flat.

District attempts to bolster its position by pointing to Act §6, which authorizes it to "purchase...personal property," and to Act §10a, which provides that it may "sell, lease, or exchange

---

[10] Among the time-honored canons of construction, "noscitur a sociis" (roughly translated as "it is known by its associates") is commonly understood to mean that a word or phrase is given content by the words immediately surrounding it. To apply that principle here, "prevention" of fire, when read in conjunction with "control" of fire, normally refers to the steps that emergency responders take to prevent and control an actual fire. Of course, resort to that--or any other--canon of construction is scarcely necessary in this instance, for the plain meaning of the statute dictates the same result--that there is an absence of statutory authority.

10

personalty."  Neither of those provisions, however, can fairly be read as enabling District to acquire any kind of "personal property" or "personalty" that may strike its Trustees' fancy. Act §6 speaks only of such property "to be used for the purposes of the fire protection district"--it does not purport to define or give content to those purposes.  Instead that portion of a likewise generic "Organization, powers and duties of board" statutory section cannot be bootstrapped into a blanket authority to take over the fire alarm monitoring business.[11]

District also argues that authority external to the Act gives it the power to enact the Ordinance.  In particular, it points to an interpretation of the Illinois Municipal Code contained in Alarm Detection Sys. v. Vill. of Hinsdale, 326 Ill.App.3d 372, 761 N.E.2d 782 (2d Dist. 2001).  That case, id. at 377-80, 761 N.E.2d at 787-89 held that a village had the authority to enact an ordinance requiring that all commercial buildings connect their fire alarm systems directly to the village's fire board.  But that ruling dealt with a wholly different statute--the Illinois Municipal Code.

In fact Hinsdale, id. at 380-81, 761 N.E.2d at 790 (citations omitted) expressly rejected as irrelevant earlier

---

[11] As for Act §10a, it is frankly absurd to characterize that provision as bearing on the subject at issue here.  Such grasping at straws (or perhaps more accurately nonexistent straws) betrays nothing more than the lawyers' desperation.

11

cases that had been decided under the Act and that read the powers of fire prevention districts more narrowly:

> Fire protection districts are not governed by the provisions of the Code and are completely separate legal entities from municipalities. Accordingly, these cases are of no import in determining the authority of municipalities.

That ruling is readily understood not only in terms of an ordinance-authorizing provision relied on by the court there--a provision contained in the Municipal Code (65 ILCS 5/11-8-2) but having no counterpart in the Act--but also because of the basic difference between a municipality, responsible for the general protection of the lives and safety of its citizens, and a fire protection district with its narrower focus. In short, District seeks to have that case carry more baggage than it can support in the current context.

District would nonetheless have this Court extend the Hinsdale case beyond its reach on the premise that to do otherwise would assertedly endanger those residing in areas regulated by fire districts. To that end District seeks to invoke Maddux v. Blagojevich, 233 Ill. 2d 508, 513, 911 N.E.2d 979, 983 (2009) for the proposition that any construction of the Act's provisions must consider the "purpose behind the act and the 'evils sought to be remedied, as well as the consequences that would result from construing it one way or the other." Leave aside that such a contention inappropriately converts what

a court "may also consider" (the actual Maddux language) into "must consider"--more importantly, (1) there is no formal legislative history for the Act, so that District's suggestion to consider the "purpose" behind the Act is nothing more than a bootstrapping invitation to adopt its own views on the subject, and (2) as Maddux, id. states before that "may also consider" addendum, the language of a statute itself is generally the best evidence of legislative intent--and here District can point to no language in the Act whose plain meaning establishes that District has the express power to enter the alarm monitoring business.

In direct contrast to the earlier-discussed Hinsdale case, the Illinois courts that have dealt with fire protection districts (and that Hinsdale distinguished on precisely that ground) have rejected efforts by such districts to claim implied powers to pass ordinances that go beyond the express powers granted to them in the Act (Glenview Rural Fire Prot. Dist. v. Raymond, 19 Ill.App.3d 272, 274-76, 311 N.E.2d 302, 304-05 (1st Dist. 1974) and Wilkes v. Deerfield-Bannockburn Fire Prot. Dist., 80 Ill.App.3d 327, 333-35, 399 N.E.2d 617, 622-23 (2d Dist. 1979)).

What has been said to this point is both confirmed and well illustrated by those judicial rejections of powers that had not been expressly set out in Act §11, followed in each instance by the legislative action needed to provide express authorization.

13

Thus after <u>Glenview</u> invalidated, for lack of statutory authorization equivalent to a building code, an ordinance requiring the installation of certain sprinkler systems, Act §11 was amended to give fire districts the "express power to adopt and enforce fire prevention codes and standards parallel to national standards" (Pub. Act. 80-453, effective Oct. 1, 1977). Similarly, Act §11 was amended to include the authority to provide an "emergency ambulance service" after <u>Wilkes</u> had held that such a service was not expressly permitted (Pub. Act. 81-1375, effective Aug. 9, 1980).

Since that time the General Assembly has continued to amend the Act--even without judicial prodding--to grant fire districts additional, quite specific powers (see Act §§11(e), (f), (g), (h) and (i)), the last such amendment having been promulgated as recently as 2009. None of this would make any sense (as a matter of either logic or statutory construction) if District's inventive overreaching of the statutes were correct.

District seeks to escape the thrust of those cases and that history by pointing to a more recent decision in <u>Orland Fire Prot. Dist. v. Intrastate Piping & Controls, Inc.</u>, 266 Ill.App.3d 744, 750-52, 637 N.E.2d 641, 645-46 (1st Dist. 1994), which held that a fire district had the authority to require the installation of a sprinkler system, even though the Act nowhere

14

mentions such systems. But an analysis of that decision reveals that it does not at all carry the day for District.

It is noteworthy that Orland did not locate the statutory authority for the sprinkler requirement in Act §11's provision relating to the "prevention and control of fire." Instead the Orland court found the authority in the already-referred-to "express power to adopt and enforce fire prevention codes and standards parallel to national standards." Here, of course, the power to enforce a fire code that is parallel to national standards has nothing to do with the issue at hand.

Just so, no provision in the Act even arguably gives District the authority to own, to the exclusion of others, and operate a fire alarm monitoring network. And on that score Orland provides District no traction whatever.[12]

Perhaps even more significantly, look at the sharp contrast between requiring owners to install sprinkler systems--the issue in Orland--and what is at issue here. District is not merely imposing a fire-prevention-related requirement on the citizenry within the jurisdiction that it serves--instead it is injecting itself into the business end of that requirement by making itself the sole source of an essential part of that requirement. Does

---

[12] District also points to a section of the Illinois Administrative Code dealing with fire alarm monitoring (83 Ill. Adm. Code §785.45), but that provision of an administrative regulation obviously cannot serve as an express grant of authority to fire districts.

15

District suggest for a moment that the Orland court would have sanctioned an ordinance that not only required the purchase of a sprinkler system but also required that the purchasers buy their systems from District itself or from a source that gave a cut to the Orland Fire District, rather than from any source competing for the sprinkler business in the free market? That has to be understood as the paradigm case of the rhetorical question, permitting only one answer: No way.

On the most basic level, District gives impermissibly short shrift to the principle that fire districts have only those powers that are expressly granted to them by the legislature--and, by extension, that they have no implied powers (see Glenview, 19 Ill.App.3d at 274, 311 N.E.2d at 304). Relatedly, statutes that confer powers on entities such as fire districts are strictly construed, with any doubts being resolved against those bodies (id., quoting City of Chicago v. Ingersoll Steel & Disc Div. of Borg-Warner Corp., 371 Ill. 183, 186, 20 N.E.2d 287, 288 (1939)).

District seeks to turn that dynamic on its head by invoking the public-safety rationale and insisting that it has carte blanche to engage in any activity--including any anticompetitive and self-aggrandizing activity--that bears some relationship to

16

fire prevention.[13]  But it does not slight the importance of the role that fire protection districts play in protecting residents and properties from fire to find that such concerns must not be conflated with (and be permitted to overshadow) the fundamental question of statutory authority.  By the same token, District misfires when it argues that other fire districts may have entered into similar arrangements.  Without further input as to the particulars of such other situations and as to whether they have survived judicial scrutiny, the naked fact that they may exist elsewhere in Illinois cannot be evidence that District has acted within its statutory authority.

**Other Counts**

In addition to their argument as to the absence of statutory authority, Plaintiffs move for summary judgment on five other counts, which respectively charge violations of rights conferred by the United States Constitution's Contracts Clause and its Fourteenth Amendment's Due Process and Equal Protection Clauses, monopolization and attempted monopolization under Sherman Act §2 and tortious interference with contract and business expectancy.

---

[13] For their part, Plaintiffs urge the applicability of Act §11f(b), which prohibits the collection of fees from residents for fire-protection services, as an alternative basis for finding that District exceeded its statutory authority.  That argument has force, but for the present it is sufficient to view it as buttressing the more fundamental issue of the absence of legal authority that forms the basis of this opinion.

Those additional counts present complex questions of fact and law, and there is no need to grapple with them here.[14]

**Permanent Injunction Order**

Plaintiffs moving for a permanent injunction must make essentially the same showing as that required for a preliminary injunction, except that they must demonstrate actual success on the merits instead of a mere likelihood of success (Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 546 n.12 (1987)). Although neither side's present submissions have analyzed the factors to be considered before issuing a permanent injunction (or have even remarked upon the test itself), the preliminary injunction order here dealt with them in detail in concluding that injunctive relief was warranted.[15] What has been said in this opinion readily confirms that the factors required for a permanent injunction have been satisfied.

First and foremost, Plaintiffs have plainly succeeded on the merits. Second, damages are inadequate because Plaintiffs have not only lost current customers but also stand to lose future

---

[14] This should not be mistaken as an indication that those claims lack merit. On the contrary, many of the additional counts present colorable (or more than colorable) claims for relief.

[15] For over 25 years this Court has referred to Judge Posner's opinion in Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 386-88 (7th Cir. 1984) for a thorough discussion of the standards for ruling on requests for preliminary injunctions, and that granted in this case was no exception.

customers in consequence of their having been barred from fire alarm monitoring in the District.  Third, the equities are in Plaintiffs' favor because they have lost or will lose their fire alarm monitoring business, while District was never in that business in the first place (and, to boot, does not have the authority to displace Plaintiffs in that capacity).  And fourth, while this Court respects District's interests in protecting people and property from fire, the fact remains that before adoption of the Ordinance, Plaintiffs had in place fire alarm monitoring services that were in compliance with national standards and approved by District.

## Conclusion

Plaintiff's motion for partial summary judgment against District is granted on the ground that District lacked the requisite statutory authority to pass the Ordinance and displace Plaintiffs from the fire alarm monitoring business.  Accordingly, Plaintiff's request for a permanent injunction is granted, the Ordinance is hereby invalidated and District is enjoined from any activity relating to its implementation and enforcement (in terms of the Clerk's Office's docketing system, this ruling grants Dkt. 136 and perforce denies Dkt. 140, Metro's motion for summary judgment).

It would appear that a formal permanent injunction order should adopt and implement Paragraphs 1, 2, 7, 8, 9, 10, 11, 12,

19

13, 14 and 15 found on pages 11-16 of the November 23, 2010 Preliminary Injunction order. Counsel for the parties are ordered to meet and confer forthwith with a view to the swift submission of a joint proposal if possible, or separate proposals reflecting any differences between them, embracing those paragraphs (unless a reason is tendered for the omission of any of them) and any others deemed appropriate in light of this opinion. Finally, a status hearing is ordered to be held at 8:45 a.m. August 2, 2011 to discuss the future course of this litigation.[16]

_____
Milton I. Shadur
Senior United States District Judge

Date: July 20, 2011

---

[16] As a consequence of this ruling, District's April 11, 2011 Dkt. 156 motion for leave to file an amended answer adding two new affirmative defenses (common law privilege and tort immunity) is denied as moot. Apart from questions as to whether and to what extent any such common law privilege subsists and might apply to District's conduct in this case, no privilege may permit District to take actions for which it has no statutory authority. And the question of tort immunity is similarly inapposite, given the ground for the present ruling, for tort liability is simply not now at issue.